Case number 23-1650 from the District of Eastern Missouri, Matthew Cartia et al. v. Bradley Beeman et al. Mr. Laramore. Good morning. Good morning. Honors, may it please the Court. My name is Anthony Laramore. I represent the appellant, Matthew Cartia and Autumn Adams. Mr. Cartia is here with us today. Ms. Adams was not able to be. Your Honors, this Court said in Tatum that there is no justification for choking a restrained, non-fighting, non-resisting subject. This Court concluded that a suspect's Fourth Amendment rights to be free from excessive force are violated if officers choke, kick, or punch them when they are restrained, not fighting, and not resisting. Judge, I know that Kelsey is an important case when we're talking about the arrest of a subject. The facts of this case are drastically more egregious than the facts of Kelsey, where the officer, and I know your Honors are familiar with that case, where an officer used a bear hug takedown maneuver when the subject didn't follow his command to get back here. In this case, what the facts show, and some of these facts are disputed, but this was a summary judgment that was entered. The facts show that Officer Beeman, one of the defendants, slammed Matthew Cartia onto his face using a hip toss maneuver while he was handcuffed and being compliant. The facts show that Officer Beeman punched and slapped Matthew Cartia in the face several times while Cartia was lying face down on the ground with his hands cuffed behind his back and while he was being compliant. These actions were all taken by Officer Beeman while he was asking Mr. Cartia, quote unquote, who's the bitch now? Officer Beeman held Cartia on the ground by placing his knee across the back of Mr. Cartia's neck, a maneuver which he admitted in a deposition he knew could be deadly, and held that position even when Mr. Cartia pleaded that he could not breathe. Officer Guglielmo, another defendant in the case, applied pressure to the back and legs of Cartia. At the same time, Officer Beeman was kneeling on Cartia's neck when Cartia was not resisting and was with his hands cuffed behind his back. Officer Guglielmo then took Mr. Cartia off the ground, took him to the patrol car, and slammed his head into the frame of the patrol car at least twice while Mr. Cartia's hands were handcuffed behind his back and while he was being compliant. Moving back on Guglielmo, when he was, I guess, using his knee or whatever to hold down Mr. Cartia, what is the theory that that by itself is excessive force? Because that would just be a restraint, it's not affecting his breathing, or is it more like he stood by while Officer Beeman took greater action? Well, I think, Judge, that when Mr. Cartia was down on the ground with his hand cuffed behind his back and while he was being compliant, I think the law says that no force is necessary. There's no reason for two officers, I mean, you can see Mr. Cartia is here in the back row with us. Both of these officers, one of them is around 300 pounds, the other one was like 375 pounds, substantially larger than Mr. Cartia. There was simply no reason for them to be kneeling on his body, and one of them kneeling across the back of his neck. But then again... No, I agree on the back of the neck. That's a different issue. I'm more worried about the ones that were non, you know, that just looked like a restraint. And, Your Honor, even if we say that Officer Guglielmo was justified in restraining his legs, there's simply no justification for his picking him up off the ground, taking him to a patrol car and slamming his head into the side of a patrol car. And then after that, Officer, while Mr. Cartia was in the back of a patrol car with his hands cuffed behind his back and was being compliant, Officer Guglielmo choked Mr. Cartia while he told him to, quote-unquote, I'm sorry for the foul language, Your Honors, but shut the fuck up, you piece of shit. These actions are clearly, clearly violations of the Fourth Amendment, clearly established law, and the force is excessive. Let's take the slamming head. This is very much, seems very much like Wordish v. Kruger. Judge, I'm not overly familiar with that case. I apologize, but I do think that it's very analogous. That was someone who was having a glycemic reaction and therefore wouldn't come out of the car and then had to be taken to the ground, and then they got him up and put him in the car and pushed his head against the, that was the excessive force charged, was slamming his head against the car, which strikes me as, if you're forcefully putting someone into a car, or particularly if you want to frisk them before you do that, you know, the head slamming into a car, into a frame of the car is pretty likely to happen. Your Honor, I agree that that could be a possibility. That's just not the facts that we have in this case before us. The witness testimony and the facts, which this incident was witnessed by Mr. Cartier's parents. One of them is a retired law enforcement officer, a former U.S. Marshal. And the testimony in the case is that not only did, this wasn't like we were trying to get him into a car and we accidentally hit his head on the frame. This was Guglielmo slamming his head into the car twice. No, it wasn't accidental in Wordish either. And so this was intentional, this was intentional conduct. Followed up by when Mr. Cartier was in the back of the patrol car, then choking him. While, again, using this foul language and telling him to be quiet. Your Honors, I think that this, because of the facts, I know in Kelsey and also in the Eller's case, both of those cases involved situations where the force was used to subdue a suspect. And the force was utilized before handcuffs were applied and before the suspect was being compliant. That's not the situation that we have in this case. And that's why I think that it's distinguishable for those two opinions, but in Tatum seems to be more on point. In that case, that's where an officer pepper sprayed the suspect and the two crashed into a display table. The suspect claimed that he did not fight or resist. There was a disagreement, Your Honors. And there's a disagreement in this case about how this incident went down. There is some video, but there's not a video of the entire incident. The video is, I think, three to four minutes long. Well, what about the district court said that he appeared to be resisting, right? Isn't that? And so, therefore, Beamon could use at least some force. What is your response to that? What facts and the record do you think the district court was relying on to say that he appeared to be resisting? Well, Judge, and I think in the memorandum that came along with the order, it was a little confusing because the court seemed to be relying on a statement made in the video by Mr. Cartier about the purpose that they were going to the residence, which was Mr. Cartier's residence at 2 Pico Court in Moscow Mills. And I think the court took that and said, well, these two were hostile toward the police, and thus they were being aggressive. But the officers never heard that statement. The statement that Mr. Cartier made about going to his residence to video the police, that statement was never heard by any of the officers in this case. So in the analysis of whether their conduct was objectively reasonable, I don't think that that should even be considered. What about the, and I know your argument might be First Amendment, but on that exact question, you know, there was more than just recording happening here. There was also some expletives coming both from the police but then also from your clients. And what role does that play in determining whether or not a reasonable officer would think they are resisting? Well, and I agree that after the assault starts that Mr. Cartier uses some foul language. Judge, I agree with that. Up until that time, my clients were compliant with what the police told them to do. They were not threatening. They did not make threatening statements. They didn't curse at the officers. They simply informed them that this was Mr. Cartier's residence. They showed their license and asked to see identification because these officers were plain clothed. They were part of the drug task force that Lincoln County has in collaboration with other counties. And so that's all my clients were doing. While videoing. The officers obviously didn't like that. But my clients were compliant. Now as far as the foul language, there was no threatening statements ever made by either one of my clients. All the officers who were on the scene agree with that. They said they were not making threatening statements. I ask in deposition, and this is part of the record in the case, Officer Beeman, did you feel like the statements that Mr. Cartier made constituted him resisting arrest? And he said no. I asked Officer Livingston, Officer Guglielmo, the other officers there, did the statements he made constitute resisting arrest? Their answer was no, it didn't feel that way. And so I think that the statements alone should not be used as justification, especially for this level of force, for choking and punching and hitting and slamming heads into. Let me follow up with one more point. And this kind of tracks us back to what I premised it on earlier, which is the recording issue. We have case law, a case called Chestnut v. Wallace, that suggests that mere recording is not something you can get arrested for, recording police behavior. We've since limited and said it's not necessarily First Amendment behavior recording. But I didn't see a bare recording claim here where you say somehow the police reacted to my recording and this caused this whole incident to happen, I was arrested, I was seized, et cetera. Am I right about that? That's right, Judge. That's not an issue in the case. And the stated reason for the arrest was they were interfering with a government operation, meaning the investigation had been going on a two-pico court. It turns out that that's not true when we get into the facts. And those charges that were brought against my clients based upon statements made by the officers that were not true and were later determined to be not true, those charges were ultimately dismissed. But the given reason that they were taken into custody was because the officers said that they were interfering with that investigation, which the fact show had already concluded. Interfering because of the video or interfering, and this gets back to Judge Kelly's question, interfering because they were resisting somehow. They were doing something more than recording. Interfering, as far as I understand, Judge, interfering by their presence at the location and in being in a driveway where Officer Beeman had given them permission to be. And, Judge, frankly, I think the facts and the video demonstrate that what really happened here was that Mr. Cartier had annoyed the officers to a sufficient level that they decided to place him under arrest. And that's what precipitated this whole event. But you're quite right. There has been no issue raised related to whether that they had the right to video or that was a precipitating factor in the case. And I see I'm running into my rebuttal time. If there's no other questions, then I'll let Mr. Dunn have the podium. Thank you, judges. May it please the Court, Counsel, Your Honors. My name is Peter Dunn. I'm an attorney with the Pitzer Snodgrass Law Firm here in St. Louis, and I represent the Lincoln County Sheriff's Department and the Lincoln County Sheriff's Office defendants of this case. This case begins, I think, and largely ends with the video of the initial confrontation between the plaintiffs and the police. What was the resisting that the district court relied on or that you're relying on that would have warranted any kind of use of force here? The resisting begins with the lack of cooperation of the plaintiffs and the lawful orders given to them to remain outside the area where this investigation was taking place. And that begins, frankly, with the statements and everything else that's in the video that's recorded before they arrived there. And before they arrived there, it's obvious that Plaintiff Cardia is upset, he's angry, he's demonstrative in the statements that he makes and his objection and lack of agreement with what's going on at his parents' home. By way of background, the police are investigating the sale of marijuana brownies at Troy Buchanan High School by this, Mr. Cardia's brother, Mr. Cardia, that resulted in felony charges against him to which he pleaded guilty. Having said all that, the police are there, their investigation was largely complete when Mr. Cardia and Ms. Adams arrived. When they show up, and this is all on video, they're loud, they're obstructionary, they're objectionable, sorry. When you say it's all on video, we don't see the plaintiffs, though, right? Because it's, I think, Adams and Selden. No, they're filming away. So I want to make sure I'm not missing another angle of the video. No, there's not a movie of the event, and we see that a lot. That is true with body cam video and other videos that they're tantalizingly incomplete. But this one isn't incomplete with regard to the attitude, the demeanor, the behavior of the two plaintiffs, which is obstructionary, uncooperative, hostile, and obviously intended to court their arrest. They really manufactured this arrest, and frankly, this lawsuit, over their own behavior. Did the officers testify that the two plaintiffs had actually crossed this sort of, I think there's like an imaginary line, right? Don't come past here, and we can't really see it in the video. But did they say, and they crossed the imaginary line? Indeed they did, and despite being told numerous times not to do that, and asked to step back, asked and told ahead of time, that look, step back or you're going to be arrested. And so they were warned. Well, that step back is different than crossing. Well, that's because they had crossed the line and were told to step back to the other side of it. And so this insistence on interfering with the, Ms. Blairmark respectfully says it's over. It's not over. They're all still there. Evidence gathering is still going on, and the police are still actively involved in this investigation. When they show up, and they show up, honestly, I don't think you can look at the video and come to any other conclusion, but they show up for the purpose of interfering with the investigation. They're aggressive, uncooperative, abusive, and then eventually profane and obscene in the statements that are made to the police. It's finally in response to all of this, this interference by Mr. Cardiot, that he's informed that he's going to be placed under arrest, and he is indeed placed in the handcuffs. However, his resistance doesn't end at that point. The hip toss that ends up taking him to the ground takes place after he's pulling away from the arresting officer because they are proceeding to arrest Ms. Adams. He objects to that loudly. Again, uses obscene, profane language towards the officer. Tell them, get your hands off my girlfriend, and he's pulling away from the officer. When he's in response to that resistance, he goes to the ground. If you analyze all of that in the context of Kelsey, the force used is far less. And if the takedown of a person walking away wearing swimming trunks is clearly unarmed, and all they're doing is disobeying an officer and walking away, taken down to the ground and injured to the point where they have a broken bone, I think a broken collarbone, clearly the bar is kind of high in the kind of force that is going to be deemed excessive under the circumstances of somebody who's resisting arrest or disobeying lawful police orders. This was a wide-ranging complaint. There were 20 counts against eight different defendants. It's just sort of a kitchen sink kind of approach to the whole thing. But the district court, or excuse me, the magistrate court, in its order, harshed out all the different claims and all the evidence in support thereof against all the different defendants and found either that no objective evidence of a Fourth Amendment violation for excessive force took place or whatever force was used. It was not clearly established at the time that it was unconstitutional. And so the court carefully went through all the claims and then addressed the state law claims that official immunity applied to, addressed the alternative liability claims against Lincoln County and the Lincoln County Sheriff. There was no evidence of those. What about after the hip toss, I didn't hear you directly address this, which is the knee on the neck where he couldn't breathe. I think by then the video was pretty useless, as I recall. I don't believe it's even recording anymore at that point. So in which case we have to take the plaintiff-friendly facts. And what's the justification for that when he doesn't appear to be resisting anymore? Or is he? Well, that's a good question because that is, from the perspective of the police, he was still resisting. And it was necessary to restrain him and hold him down. And this goes into, frankly, evidence of this, of what happened later is relevant because he insists that, oh, he was calm, he was not resisting anymore. But when they get to the Lincoln County Sheriff's Office, he's restrained for a brief period of time. That was another part of the claim. That's his 14th or 8th Amendment claim for cruel and unusual punishment. And I'll only say that this is not the conduct of someone who is now quietly cooperating, an attitude which is completely belied by the person who's recorded earlier, just a few moments earlier, when he arrives on the scene. But he was handcuffed at the time. Correct. And so it just seems a little gratuitous to then, and frankly, it bears a little resemblance to the acts taken by the officers in the George Floyd case. And so I'm just trying to figure out what justification there was for that particular act of placing your knee on the neck. Restraining somebody who has already demonstrated that they will not cooperate after being placed into handcuffs, which is what the officers found this particular plaintiff did at that scene. Yes, the duration of time in the Floyd case, and I'm going only by what I see in the news, which was apparently excessive, obviously excessive enough that he's no longer with us. Mr. Cartier certainly can't make that claim. But whatever it was, it was brief in duration and add a legitimate law enforcement purpose, which is the issue, I guess, with regard to the analysis of whether force that's used is appropriate or not. Penny Cook is cited in the briefs, and the court pivoted away from a quantum of injury approach to analysis of Fourth Amendment claims. What was the purpose? What was the law enforcement purpose behind the application of force? And in this instance, everything we're talking about had a legitimate law enforcement purpose. Punching and slapping? That was the other thing we've got that is alleged against Beeman. What was the purpose of punching and slapping? The slap to the face? I'll only say that that's disputed evidence. But having said that, if we assume for a moment that it's true, as I thought about this, actually, because I wondered whether this would come up, and the conclusion I came to is that, you know, taken alone, one might think that that seems gratuitous and unnecessary. But as I look through the cases that discuss application of force, I don't find one that clearly says an officer is committing a Fourth Amendment violation when something like that happens. And in the context, and this came up in the argument in the magistrate court below, that in the totality of the circumstances here and in the context of the amount of resistance, the amount of objection, the poor language, the obvious intention to interfere with what's going on, I'm not saying, and would never say, that such a thing is objective or is not objectionable. But I would also say that there isn't anything that I'm aware of that provides clear evidence to an officer that such behavior constitutes a Fourth Amendment violation. And I'm not saying that the court ought to endorse such behavior, but I am saying that if it's not clearly established that such behavior can't be engaged in, well, then no reasonable officer would know that they're committing a violation at the time, and that that Qualified Immunity applies to that, too, in my opinion. What about Guglielmo, and I've got to ask about this because this is the other thing that bothered me, was the purposeful, it appears purposeful, I don't know that he could necessarily say it was purposeful, but we had the slamming of the head into the police car and then choking him while he's in the back of the police car. That doesn't look good either. Again, assuming it's true. Again, the optics of it are bad, and for purposes of summary judgment, the evidence on that point was disputed. No one conceded or admitted that anything remotely close to that happened. And we went, again, frankly, in the argument in the magistrate court, went back to the fact that we were talking about someone who had kind of created this confrontation themselves. They created this lawsuit themselves. From the first instance, they could have said, fine, right, I'll wait here, and I'll wait to talk to someone calmly. But they didn't do that at any point. And I'm not saying it did happen. I'm just saying I don't think it's appropriate to create a cause of action, and for what amounts to what can't be anything other than a brief period of time, does something that, standing alone, cannot be regarded, I think, as something that is not clearly established, that it can't be done. And again, I don't think that the court is endorsing such behavior by saying that if it's not clearly established it can't be done, it doesn't constitute a violation. Your Honor, I appreciate the opportunity to be here. Unless there's any other questions, I'll sit down. Thank you. Your Honor, thank you. We've cited a number of cases that clearly establish that officers can punch, kick, choke, engage in that type of conduct. While the evidence, and I agree with Pete, the evidence is disputed, which is exactly why this case should not have been decided on summary judgment. Instead, it should have been placed in front of a jury for a decision. But there's a number of cases that say where that kind of conduct is undertaken by officers, that that is a clear violation of the Fourth Amendment. We listed many of those in our brief in the case, and I think chief among them is, like I said, the Tatum case. This is clearly distinguishable from Kelsey and Ehlers, because you just have a use of force that is completely unwarranted and unnecessary. There is no excuse for having someone in the back of a patrol car and having them handcuffed and compliant, and that's what the evidence suggests. It's disputed, but that's what the facts that we've elicited and the testimony suggests, and choking them and telling them to shut the fuck up. Well, Broussard was pretty close as to the son, the aspect that after he was in the car. I'm sorry? Broussard or Broussard? And, Judge, I think the thing that distinguishes this is the evidence suggests that Mr. Cartier was being compliant with the officers at that time. There was no tussling around. There was nothing about his behavior that would have warranted additional uses of force. The son only refused to move over in the back seat of the car, and he got tased because it had been quite a fairly violent encounter before that. And we don't even have that in this case, Judge, not even that little fact. And here is, I think, something that's key in the evidence, because when we deposed Officers Guglielmo and Officers Beeman, they were deposed twice, once in the criminal case that was ultimately dismissed, then once in the case that's before the court today. They were deposed the first time before they knew a video existed. And then after this video was discovered and they were deposed a second time, well, the story changed. But both of them indicated in their deposition. When I asked them about punching and slapping, when I asked Officer Beeman, why did you punch or slap Mr. Cartier, he said, well, I didn't do it. Well, there have been any justification for doing that? None whatsoever. It wasn't necessary. When I asked Officer Guglielmo, was it ever necessary to choke Mr. Cartier, he said, no, it wasn't. Was there any justification for you slamming his head into the side of a car? No, there was none. And so that's from the officer's own mouths. That's the evidence in the case. That's the evidence that, frankly, was just flatly ignored by the magistrate court in this case. Rather than focusing on what happened, again, after my client was in handcuffs, and what the evidence suggests was he was being compliant. Rather than focusing on that, the court instead, and I went back and looked at the order while Mr. Dunn was making his argument. Rather than focusing on that, instead the court focused on a statement that was made before they ever arrived at the scene, which no officers heard, which was not considered by the officers, and which simply said, and maybe language I wouldn't use, but simply said, there are officers at my house, I'm concerned with that, I'm going to go there and I'm going to video what they're doing. I mean, I think that's a perfectly reasonable thing to do. But based upon the evidence in the case, this case certainly should have been submitted to a jury and summary judgment wasn't warranted on these facts. And I'd ask the court to send this case back so that we can have a jury decide this. Thank you very much, Your Honors. Thank you, Counsel. The case has been well briefed and argued, and we'll take it under advisement. Thank you.